# LEWIS v. FRICK, UNITED STATES IMMIGRATION INSPECTOR.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 208. Argued January 28, 1914.—Decided April 6, 1914.

Where an alien enters this country more than once, the period of three years from entry prescribed by §§ 20 and 21 of the Alien Immigration Law runs not from the date when he first entered the country, but from the time of his entry under conditions within the prohibitions of the act. *Lapina v. Williams,* 232 U. S. 78.

Where, as in this case, there was evidence sufficient to justify the Secretary of Commerce and Labor in concluding that the alien was within the prohibitions of the Alien Immigration Act, and the hearing was fairly conducted, the decision of the Secretary is binding upon the courts.

Under § 2 of the Alien Immigration Act of 1907 as amended in 1910, it is an offense for any person, citizen or alien, to bring into this country an alien for the purposes of prostitution, and any alien so doing or attempting to do may be excluded on entry or deported after entry.

A conviction under § 3 of the Alien Immigration Act is not necessary

for exclusion on entry or deportation after entry of an alien who has
brought into this country an alien for the purpose of prostitution,
nor is a verdict of acquittal of a charge under § 3 *res judicata* as to a
proceeding before the Secretary under § 2 of the act.

There is a distinction between a criminal prosecution and an adminis-
trative inquiry by an Executive Department or subordinate officers
thereof. *Zakonaite* v. *Wolf*, 226 U. S. 272.

The destination of an alien whose deportation after a second entry is
based on § 2 of the Alien Immigration Act is to be determined in the
light of §§ 20, 21 and 35 of the act and is not controlled by the facti-
tious circumstance of his going to a contiguous country to obtain the
alien brought in for purposes of prostitution. The act admits of his
being returned to the country whence he came when he first entered
the United States.

*Quære*, whether the act leaves any room for discretion on the part of
the Secretary; and whether that part of a deportation order deter-
mining destination of the alien is open to inquiry on *habeas corpus*.

195 Fed. Rep. 693, affirmed.

THE facts, which involve the construction of the provi-
sions of the Alien Immigration Act in regard to deporta-
tion of undesirable aliens, are stated in the opinion.

*Mr. Guy W. Moore*, with whom *Mr. Frederic S. Florian*,
*Mr. Philip T. Van Zile* and *Mr. H. P. Wilson* were on the
brief, for petitioner.

*Mr. Assistant Attorney General Wallace* for the United
States.

MR. JUSTICE PITNEY delivered the opinion of the court.

Petitioner is an alien and a native of Russia. He came
thence to this country, entering at the port of New York,
in the month of September, 1904, lived in or near New
York City until March, 1910, then removed to Detroit,
Michigan, and has since made that city his home. On
November 17, 1910, he crossed the river from Detroit
to Windsor, Canada, and brought back with him into the
United States a woman, avowed by him to be his wife, but

whose actual status was questioned, as will appear. A few days later he was arrested upon a warrant from the Department of Commerce and Labor, issued under the Immigration Act of February 20, 1907, as amended March 26, 1910, and after a hearing conducted by an inspector, the Secretary, on February 14, 1911, found ".That said alien is a member of the excluded classes, in that he . . . procured, imported and brought into the United States a woman for an immoral purpose," etc., and thereupon ordered that he be deported to the country whence he came, to wit, Russia.

Meanwhile, he was indicted in the United States District Court for a violation of § 3 of the Act, the charge being that on the occasion above referred to he knowingly imported an alien woman from a foreign country for an immoral purpose, to wit, illicit concubinage and cohabitation. The trial of the indictment resulted, on March 23, 1911, in a verdict of not guilty.

On April 13th petitioner, being in custody under the deportation warrant, sued out a writ of *habeas corpus* from the United States Circuit Court. Appended to his petition for the writ was a copy of the record of his examination by the inspector, including the testimony and a list of exhibits but not the exhibits themselves. In his answer the immigration inspector set up the warrant of deportation as his authority for detaining petitioner, and recited the arrest and examination, and the finding of the Secretary of Commerce and Labor.

The Circuit Court held that there was no authority in the immigration law for deporting an alien because he had imported a woman for immoral purposes; that such importation might be fully proved, or, indeed, might be admitted by the alien, and still the Department of Commerce and Labor would be without jurisdiction to deport; that it had such jurisdiction only under § 3 of the Act, and only in case of conviction; that because by § 3 Congress

provided that where the woman imported is an alien and the person importing is an alien, a felony is committed, and the person convicted of this felony may be deported, therefore under the ordinary rules of statutory construction it must be held that out of the general class covered by § 2 Congress had selected a particular class named in § 3, and subjected it to a severe punishment, but in connection therewith had limited the right to deport to cases where there was a conviction. That the right to prosecute criminally and the right to deport are inconsistent as concurrent rights, and cannot both be exercised at the same time; and that Congress saw the necessity of making the proceedings successive, and clearly made the second step depend upon the result of the first. Hence, an order was made for the discharge of petitioner. 189 Fed. Rep. 146.

Upon appeal, the Circuit Court of Appeals reversed this judgment, 195 Fed. Rep. 693, holding that the power to deport an alien existed under §§ 2 and 21 of the act, irrespective of § 3; and further that the right to deport in this case could be found in § 3 in connection with § 21, without regard to conviction or acquittal under § 3. The court also held that the acquittal of Lewis was not *res judicata* of the present proceeding, and that since there was evidence tending to support the finding of the Secretary of Commerce and Labor respecting the bringing in of the woman for the purpose of prostitution, that finding was conclusive. And, finally, it sustained the deportation of petitioner to Russia rather than to Canada, holding that the former was "the country whence he came," within the meaning of the act.

The provisions that are especially pertinent are set forth in the margin.[1]

---

[1] "An Act To regulate the immigration of aliens into the United States," approved February 20, 1907, c. 1134, 34 Stat. 898, as amended by act of March 26, 1910, c. 128, 36 Stat. 263.

The decision of the Circuit Court of Appeals is attacked here on several grounds. The first is based upon the fact that the alien had an established domicile and residence in the United States dating from September 20, 1904, having obtained his admission into the country legally, and maintained a domicile here continuously from the date

"Sec. 2. That the following classes of aliens shall be excluded from admission into the United States . . . persons who procure or attempt to· bring in prostitutes or women or girls for the purpose of prostitution or for any other immoral purpose. . . .

"Sec. 3. That the importation into the United States of any alien for the purpose of prostitution or for any other immoral purpose is hereby forbidden; and whoever shall, directly or indirectly, import, or attempt to import, into the United States, any alien for the purpose of prostitution or for any other immoral purpose, . . . shall, in every such case be deemed guilty of a felony, and on conviction thereof be imprisoned not more than ten years and pay a fine of not more than five thousand dollars. . . . Any alien who shall be convicted under any of the provisions of this section shall, at the expiration of his sentence, be taken into custody and returned to the country whence he came, or of which he is a subject or a citizen in the manner provided in sections twenty and twenty-one of this act. . . .

"Sec. 20. That any alien who shall enter the United States in violation of law, . . . shall, upon the warrant of the Secretary of Commerce and Labor, be taken into custody and deported to the country whence he came at any time within three years after the date of his entry into the United States. . . .

"Sec. 21. That in case the Secretary of Commerce and Labor shall be satisfied that an alien has been found in the United States in violation of this Act, or that an alien is subject to deportation under the provisions of this Act or of any law of the United States, he shall cause such alien within the period of three years after landing or entry therein to be taken into custody and returned to the country whence he came, as provided by section twenty of this Act. . . .

"Sec. 35. The deportation of aliens arrested within the United States after entry and found to be illegally therein, provided for in this Act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which said aliens embarked for such territory."

of his entry until the time of his arrest; and it is insisted that the fact of his having crossed the river into Canada, even though it was done with the object of bringing a woman into this country for the purpose of prostitution, did not bring him within the reach of the Immigration Act or subject him to the summary procedure therein prescribed.

This question is settled adversely to the contention of petitioner by our recent decision in *Lapina* v. *Williams*, 232 U. S. 78. That case arose under the act of February 20, 1907, while this arises under the same act as amended March 26, 1910. But the changes are not such as to affect the authority of that decision upon the present point.

In *Lapina* v. *Williams* it did appear that the alien had practiced prostitution for many years before her temporary departure from the country, and that she not only returned with the intent to continue the practice but did almost immediately engage in it, and continued it until her arrest under the provisions of the Immigration Act. But the real ground of decision was that Congress in the act of 1903 sufficiently expressed, and in the act of 1907 reiterated, the purpose of extending the prohibition against the admission of aliens of certain classes, and the mandate for their deportation, to all aliens within the descriptive terms of the excluding clause, irrespective of any qualification arising out of a previous residence or domicile in this country. This view was based (a) upon the legislative history of the act of 1903 (from which the material provisions of the 1907 act were taken), which was a reenactment of previous laws, but with the deliberate omission of the word "immigrant" and of certain other qualifying phrases that had been construed by the courts as giving so limited meaning to the word "alien" as not to include aliens previously resident in this country and who had temporarily departed with the intention of returning; (b) upon the clear language of the excluding clause of § 2

of the act of 1907 (quoted in full, 232 U. S. 91); (c) upon the fact that none of the excluded classes (with the possible exception of contract-laborers) would be ' any less undesirable if previously domiciled in the United States; and (d) upon the fact that the section contains its own specific provisos and limitations, which, upon familiar principles, tend to negative any other and implied exception.

· We hold, therefore, that the fact that the petitioner, Lewis, had been domiciled for six years or more in this country, he remaining still an alien, did not change his status so as to exempt him from the operation of the Immigration Act; and that if he departed from the country, even for a brief space of time, and on reëntering brought into the country a woman for the purpose of prostitution or other immoral purpose, he subjected himself to the operation of the clauses of the Act that relate to the exclusion and deportation of aliens, the same as if he had had no previous residence or domicile in this country. In short, the period of three years from entry, prescribed by sections twenty and twenty-one, runs not from the date when the alien first entered the country, but from the time of the prohibited entry; that is to say, in the present case, the entry made by the alien when bringing in the woman.

The next question is whether there was sufficient evidence to fairly sustain the finding of the Secretary of Commerce and Labor to the effect that petitioner did on November 17, 1910, import and bring into the United States a woman for an immoral purpose. Upon this question, petitioner's contention was and is, that the woman is in fact his wife. He testified that he married her in Warsaw shortly before he came from Russia to this country, and that when he brought her across the river from Windsor he intended that he and she should live together in Detroit as husband and wife. The conten-

tion of respondent was and is, that the story of the marriage was a pure fabrication, resorted to in the effort to conceal the fact that the woman was a prostitute and imported by petitioner for immoral purposes. There is much in the evidence to support this view. Petitioner admitted that his real name was not Lewis, but Prezysuskier, and his "other name" was Nossek; that he first used the name of Lewis after coming to this country; that his father's name was Chaskel Prezysuskier; that he knew his alleged wife as "Leah," and did not know her other name, if any; that he knew her father as "Isaac," but did not know whether he had any other name; that two friends were present at the ceremony, but he could not remember their names; that he lived with the woman in Warsaw for five or six months, and then separated from her because he heard stories of improper conduct on her part, and that he afterwards heard she had had children before the marriage. Being questioned concerning his life in New York he professed himself unable to give the names of several persons among those with whom he said he had come in contact, and who could presumably have been called either to corroborate or to contradict his testimony. He declared that he had not seen his alleged wife since coming to America until the occasion when he met her at Windsor. Being asked "How did you happen to meet her at that time?" he answered as follows: "I was home not working one day and Berman comes up and asks for me and I don't know how he got my address and I was surprised that a strange man should ask for my name but my cousin, Mrs. Newman, told him he should come back at night when I got home from work and he came back and said 'I have regards for you' and he said, 'Are you Lewis' and I said 'Yes' and he asked me questions, if I was ever in Warsaw and I said 'Yes,' and he said, 'I have regards from your wife' and I pretended to say that I haven't got any, because I kept myself single, but still

when he mentioned the name I knew what it was and I said, 'Where is she, what does she want of me' and he said 'She is not here, she is in Canada, but I will let you know when she gets here.' On the 17th I went to work in the morning and at dinner time when I got back Mr. Berman was there waiting for me. I said, 'What is the matter' and he said, 'I received a telegram that my wife and your wife are coming here and I want you to come over with me to Windsor and meet them,' and I said, 'She will come over to the Immigration Office they should send for me over there and she could get out.' Well he said it was better for me to come over there, 'For you know how a woman is'; he said, 'She might make you trouble' and I didn't think about it, so I went there and met her and I went over to Windsor and stood there 15 or 20 minutes and got a train to the station at Windsor and met her there but very cool and came over here to the Immigration Office."

The story is extraordinary. How it happened that the alleged wife, who had known him as Prezysuskier in Warsaw, was able through the good offices of an entire stranger to identify him as Lewis, in Detroit, more than six years later, was not explained. The alleged husband's readiness to accept her is equally suspicious. There were other circumstances tending to discredit the story of the marriage. And if that story fell, the inference of an unlawful purpose was irresistible. It should be mentioned that the exhibits introduced upon the examination on which the warrant of deportation was issued are not included in the record; but it does appear that among them was a statement made by the alien at police headquarters in Detroit on November 21, 1910. Were there doubt whether the testimony itself, without the documentary evidence, would support the action of the Secretary of Commerce and Labor, we should be inclined to say that a court ought not to set aside that action without at least requiring the

production of the exhibits that were presented to the Secretary. But, without regard to them, enough appears to show that he was fully justified in concluding as a matter of fact that the whole story of the marriage in Warsaw was a fabrication, and that in truth Lewis went from Detroit to Windsor upon information from which he inferred that the woman was an alien and a prostitute, willing to accompany him to Detroit for an immoral purpose, and that he brought her to Detroit for that purpose.

This being so, and there being no contention that the hearing was not fairly conducted, the finding of the Secretary upon the question of fact is binding upon the courts. *Low Wah Suey* v. *Backus*, 225 U. S. 460, 468; *Zakonaite* v. *Wolf*, 226 U. S. 272, 275.

Respecting the construction of the act, we cannot assent to the view entertained by the Circuit Court. Section 2 declares that certain classes of aliens shall be excluded from admission into the United States, and among them "persons who procure or attempt to bring in prostitutes or women or girls for the purpose of prostitution or for any other immoral purpose." This section applies only where an alien brings in a woman or girl for the purpose indicated. It does not declare that the woman or girl need be an alien. Section 3 prohibits the importation of "any alien" for the purpose of prostitution or for any other immoral purpose. Of course, in order to constitute an offense against this section, the person brought in must be an alien. But the person need not be a woman or girl. This is clear from the changes made by Congress in § 3 when amending it in 1910. The section as it stood in the 1907 act (34 Stat. 898, 899, c. 1134) forbade and rendered felonious the importation or attempt to import "any alien woman or girl for the purpose of prostitution, or for any other immoral purpose"; the phrase "alien woman or girl" being repeated in other

clauses of the section; and one of the principal changes made in 1910 (36 Stat. 263, 264, c. 128) was to eliminate the words "woman or girl," so that now the section prohibits the importation of "any alien" for the purposes referred to, and declares that whoever shall import or attempt to import "any alien for the purpose," etc., or shall hold or attempt to hold "any alien" for any such purpose, etc., or shall keep, etc., in pursuance of such illegal importation "any alien," shall be deemed guilty of a felony. The purpose of the amendment is not to be mistaken. Moreover, the offense is made a felony irrespective of whether it is committed by an alien or by a citizen of this country, the only difference being that by one of the clauses any alien convicted under this section is, after the expiration of his sentence, to be returned to the country whence he came, or of which he is a subject or a citizen.

Again, § 20 provides: "That any alien who shall enter the United States in violation of law" shall be deported "at any time within three years after the date of his entry into the United States." This certainly includes those who enter in violation of § 2; indeed, violators of § 3 may not have "entered" at all, within the meaning of the Act.

Consequently, we deem that the Circuit Court erred in holding that the Act does not provide for deporting an alien for the offense of procuring or attempting to bring in prostitutes, etc., in the absence of a conviction for the felony under § 3. Section 2, read in connection with §§ 20 and 21, is not thus conditioned. And, as just now pointed out, the offense aimed at in § 2 and that which is punishable under § 3 are not the same. In short, it cannot be said that out of a general class covered by § 2, Congress selected the particular class named in § 3, for the latter class is not entirely included within the former.

We agree with the Circuit Court of Appeals that the

verdict and judgment acquitting petitioner under the indictment does not render the present controversy *res judicata.* The issue presented by the traverse of the indictment was not identical with the matter determined by the Secretary of Commerce and Labor. And, besides, the acquittal under the indictment was not equivalent to an affirmative finding of innocence, but merely to an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused. The distinction between a criminal prosecution and an administrative inquiry by an Executive Department or subordinate officers thereof has been often pointed out. *Zakonaite* v. *Wolf,* 226 U. S. 272, 275, and cases cited; *Williams* v. *United States,* 186 Fed. Rep. 479.

The final contention is that petitioner should have been deported to Canada, whence he came upon the occasion of his unlawful entry into this country, rather than to Russia, the land of his birth, from which he came six years earlier. By § 20, the alien is to be "deported to the country whence he came at any time within three years after the date of his entry into the United States;" by § 21, the Secretary of Commerce and Labor, upon being satisfied that an alien is subject to deportation, "shall cause such alien within the priod of three years after landing or entry therein [within the United States] to be taken into custody and returned to the country whence he came, as provided by section twenty of this Act;" by § 3, an alien convicted thereunder is at the expiration of his sentence to be "returned to the country whence he came, or of which he is a subject or a citizen in the manner provided in sections twenty and twenty-one of this Act;" and by § 35, "The deportation of aliens arrested within the United States after entry and found to be illegally therein, provided for in this act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States; or, if such embarka-

tion was for foreign contiguous territory, to the foreign port at which said aliens embarked for such territory."

Petitioner not having been convicted under § 3, his destination is to be determined rather in the light of §§ 20, 21, and 35. And first, we take it to be clear (notwithstanding the peculiar phraseology of § 20) that the three year period limits only the authority to deport, and does not affect the determination of the country to which an alien is to be deported. Respecting this matter; the sections are somewhat lacking in clearness. But, at least, § 35 indicates a legislative intent that aliens subject to deportation shall be taken to trans-Atlantic or trans-Pacific ports, if they came thence, rather than to foreign territory on this continent, although it may have been crossed on the way to this country. This was recognized by Rule 38 of the Immigration Regulations, in force December 12, 1910.

It is to be noted that the classes of aliens who are subject to deportation are not wholly made up of those who enter in violation of the law; in some cases cause for deportation may arise after a lawful entry. And in many cases the unlawfulness of the entry may not be discovered until afterwards. The theory of the Act, as expressed in § 2, is that the undesirables ought to be excluded at the seaport or at the frontier; but §§ 20, 21, and 35, recognize that this is not always practicable. Of course, if petitioner's attempt to bring a woman into the country for an immoral purpose had been discovered in time, he might have been physically excluded from entry at Detroit upon his return from Windsor. In that event he would naturally have remained upon Canadian soil. But since his offense was not discovered in time to permit of his physical exclusion, so that he becomes subject to the provisions for deportation, his destination ought not to be controlled by the factitious circumstance that he went into Canada to procure the prostitute. And, upon the whole, it seems to

us that the Act reasonably admits of his being returned to the land of his nativity, that being in fact "the country whence he came" when he first entered the United States. See *Lavin v. Le Fevre*, 125 Fed. Rep. 693, 696; *Ex parte Hamaguchi*, 161 Fed. Rep. 185, 190; *Ex parte Wong You*, 176 Fed. Rep. 933, 940; *United States v. Ruiz*, 203 Fed. Rep. 441, 444. We need go no further, and may therefore leave undecided the question whether the Act leaves any room for discretion on the part of the Secretary of Commerce and Labor.

We have assumed, without deciding, that that part of the deportation order which determines the destination of the alien is open to inquiry upon *habeas corpus*.

*Judgment affirmed.*